IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAM SANTIAGO,                          :
                    Petitioner             :
                                           :
        vs.                                :    CIVIL NO. 1:CV-11-1319
                                           :
JOHN KERESTES, et al.,                     :    (Judge Caldwell)
                    Respondents            :
                                           :
                                           :


M E M O R A N D U M

I.    *Introduction*

        William Santiago, currently confined at SCI-Greene, Waynesburg,

Pennsylvania, has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254.  The petition  challenges Santiago's 2005 conviction in the Court of Common

Pleas of York County, Pennsylvania, for the first-degree murder of William Barnes.

Petitioner was sentenced to life in prison.  Named as respondents are John Kerestes, the

superintendent at SCI-Mahanoy, Frackville, Pennsylvania, where Santiago was

incarcerated at the time he filed his petition, and the Attorney General of the

Commonwealth of Pennsylvania.

        The petition makes the following claims of trial-counsel ineffectiveness: (a)

counsel promised the jury they could see newspaper articles containing facts about the

case that could have been used by inmate witnesses who testified against Petitioner but

failed to insure that the articles were sent out with the jury during their deliberations; (b)

he failed to object to an erroneous jury instruction that told the jury they should *not* view

the testimony of an accomplice with disfavor because it comes from a corrupt or polluted source; (c) he failed to object to the trial court's erroneous explanation of transactional immunity given to a prosecution witness; and (d) he failed to object to the trial court's erroneous colloquy with Petitioner concerning his Fifth Amendment right not to testify which led Petitioner not to testify when he would have if given proper advice.  Second, the trial court erred in denying Petitioner's motion to suppress evidence seized from his house.  Third, the trial court violated due process in allowing Shannon Ritter and Shanika Simms to testify as the prosecution disclosed Ritter only on the eve of trial and Simms was not disclosed until after trial had begun.

II.  *Standard of Review*

We can only grant relief for violations of federal law, not state law. *Swarthout v. Cooke*, ___ U.S. ___, ___, 131 S.Ct. 859, 861, 178 L.Ed.2d 732 (2011). And our habeas review of the state courts' resolution of Petitioner's claims is governed by 28 U.S.C. § 2254(d)(1) and (d)(2).  Under subsection (d)(1), we may grant the writ if the state courts' adjudication of the claims was contrary to clearly established Supreme Court precedent or an unreasonable application of that precedent.  A state court judgment is "contrary to" Supreme Court precedent when it is "diametrically different, opposite in character or nature, or mutually opposed" to "clearly established" decisions of the United States Supreme Court.  *Williams v. Taylor,* 529 U.S. 362, 405-06, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000).  "A state-court decision will also be contrary to" Supreme Court "precedent if the state court confronts a set of facts that are materially indistinguishable

from a decision of [the] Court and nevertheless arrives at a result different from [the] precedent." *Id.* at 406, 120 S.Ct. 1519-20.

"[A] state court ruling is considered an 'unreasonable application' if the state court unreasonably applies the correct legal rule to the particular facts, unreasonably extends a legal principle to a new context, or unreasonably refuses to extend the principle to a new context where it should apply." *McMullin v. Tennis,* 562 F.3d 231, 236 (3d Cir. 2009)(cited cases omitted). "The unreasonable application test is an objective one - a federal court may not grant habeas relief merely because it concludes that the state court applied federal law erroneously or incorrectly." *Jacobs v. Horn,* 395 F.3d 92, 100 (3d Cir. 2005)(cited cases omitted). If "'fairminded jurists could disagree' on the correctness of the state court's decision," habeas relief cannot be granted. *Harrington v. Richter,* ___ U.S. ___, ___, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011)(quoted case omitted).

Under subsection (d)(2), we may grant the writ if the state courts' adjudication of the claims "resulted in a decision that was based on a unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). "A state court decision is based on 'an unreasonable determination of the facts' only if the state court's factual findings are 'objectively unreasonable in light of the evidence presented in the state-court proceeding.'" *Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013)(quoted case omitted), *petition for cert filed*, No. 13-45 (U.S. July 8, 2013). State-court fact finding "is presumed

to be correct." 28 U.S.C. § 2254(e)(1).  The petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  *Id.*

III.  *Discussion*

    A.  *Claims of Trial Counsel Ineffectiveness*

        1.  *Trial Counsel Was Not Ineffective in Failing to Send Newspaper Articles Out With the Jury*

Petitioner claims trial counsel was ineffective when he broke a promise he made to the jury in his opening statement that they could see newspaper articles containing facts about the case.  The articles were relevant to the defense strategy that the jailhouse informants who testified against Petitioner could have obtained their information from the articles.[1]  Petitioner argues that his lawyer's ineffectiveness was shown when the jury asked to see the articles but were told they could not because defense counsel had agreed that they not be sent out with the jury.

We provide some factual background.  In his opening, trial counsel said that the jailhouse informants could not be believed and that they obtained their information about the case from the newspapers:

> The primary witnesses in this case are in jail or in trouble.
> You'll hear, we'll show you a blow up that the Dispatch and
> the Daily record covered this case, the local newspapers, and
> that the inmates at YCP [York County prison], have access to
> it.  You'll hear that.  And they all are attuned.  They are tuned

---

[1]  There were two jailhouse informants, Shannon Ritter and Anthony Spencer.  Fred Goff testified to admissions Petitioner made to him within a few days of the murder, before Goff spent a brief amount of time in prison.  But because he did spend some time in prison, he also was questioned about his ability to obtain information from newspapers while in prison.

in.  They want to know what's going on.  Why?  Because they
want to get their rear ends out of jail.  You'll hear that.

. . . .

The gist of it is they all – all the snitches have the general
story.  And I'll show you a blow up of where they got it.  They
got it from the newspaper.  That's what you'll hear.

(Doc. 24-2, ECF pp. 153, 154).

Trial counsel followed up on this point when cross-examining Shannon

Ritter.  Ritter admitted that newspapers were available at the prison.  (Doc. 24-3, ECF p.

136).  Fred Goff admitted he had used information he had found in the newspaper.  (Doc.

24-3, ECF p. 72).

In his closing, counsel also referred to the newspaper articles:

So Mr. Goff is starting to mix up the facts.  You'll see,
assuming you take this back, the local newspapers published
pictures and details right after this, two articles, okay?  You'll
hopefully get to see these things.  These things include –
these articles include the probable cause affidavit that I had
the detective put in yesterday.  The probable cause affidavit is
what summarizes the arrest.

And, remember, I took a lot of time going through all these
jailhouse snitches to say you guys have access to
newspapers.

. . . .

The bottom line is nothing that these people said, nothing,
could not have been read from the newspaper or heard on
TV, nothing, including Freddie Goff.

(Doc. 24-3, ECF pp. 173-74).

Defense counsel introduced two newspaper articles into evidence (Doc. 24-3, ECF pp. 166, 167; Doc. 24-4, ECF pp. 4-9, newspaper articles), but declined to have them go out with the jury.  He stated he was "fine with them not going back, the two articles, because it talks about the mothers' clash in court and some other things that aren't relevant."  (Doc. 24-3, ECF p. 215).

During their deliberations, the jury requested the articles.  The court denied that request, noting, in part, that the articles were offered "not to show the content, but to say that newspapers are available at the jail and information about this case was in them."  (Doc. 24-3, ECF p. 219).

At the PCRA hearing, trial counsel testified about his strategy concerning the newspaper articles.[2]  He acknowledged he said in his opening that he would use the articles to show the informants had access to information about the case.  (Doc. 24-5, ECF p. 122).  He also said that access to the newspapers was one of the defense theories about "how a lot of these snitches knew anything about the case," and that he brought the articles out on cross-examination.  (*Id.*, ECF p. 123).

In its PCRA opinion, the superior court rejected the claim that counsel was ineffective in not sending the articles out with the jury.  First, the court agreed with the trial court that counsel had a valid reason for not doing so because the articles contained prejudicial information, for example, that Petitioner was in jail on an unrelated charge.

---

[2]  Petitioner presented his claims of ineffectiveness in postconviction proceedings under the Pennsylvania Post Conviction Relief Act (PCRA).  42 Pa. Con. Stat. Ann. §§ 9541-9546.

(Doc. 24-6, ECF p. 78, *Commonwealth v. Santiago*, No. 1346 MDA 2009 (Pa. Super. Ct. Aug. 18, 2010). Second, trial counsel's strategy, as revealed in the PCRA hearing, was to elicit the jailhouse informants' access to the articles on cross-examination. (*Id.*). Taking these two considerations together, trial counsel had a reasonable basis for not giving the jury an opportunity to see the articles during their deliberations. (*Id.*).

Claims of ineffective assistance of counsel are governed by *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Strickland* sets forth a two-prong test to establish ineffectiveness. First, counsel's performance must be deficient. *Jacobs v. Horn,* 395 F.3d 92, 102 (3d Cir. 2005)(citing *Strickland*). Second, counsel's deficient performance must have prejudiced the defense. *Id.* (quoting *Strickland*). A petitioner must "show 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at 105 (quoting *Strickland*).

We cannot say that the superior court's ruling was contrary to clearly established Supreme Court precedent established in *Strickland*, or an unreasonable application of *Strickland*. Trial counsel only promised that he would show that the articles existed and that the inmates might have had access to them. The trial record shows that he accomplished this and forcefully argued to the jury that access to the articles meant that the jailhouse informants and Goff had lied. We cannot see how this is not a reasonable trial strategy, especially when our review of a state-court's ruling on an

ineffectiveness claim is "doubly deferential." *Knowles v. Mirzayance,* 556 U.S. 111, 123, 129 S.Ct. 1411, 1420, 173 L.Ed.2d 251 (2009).

In arguing for ineffectiveness, Petitioner relies on cases dealing with a defense lawyer's promise to the jury that he will produce evidence, and then he fails to do so. *See, e.g., McAleese v. Mazurkiewicz*, 1 F.3d 159, 166 (3d Cir. 1993).[3] Those cases are distinguishable. First, trial counsel did produce the evidence. Second, he never promised that the jury would actually be able to examine the articles, only that they would know that they existed and that they could have been used by the jailhouse informants to fabricate their testimony.

>   2. *Trial Counsel Was Not Ineffective in Failing to Object to an Erroneous Jury Instruction that Told the Jury They Shouldn't View the Testimony of an Accomplice With Disfavor Because It Comes From a Corrupt or Polluted Source*

Petitioner claims trial counsel was ineffective when he failed to object to an erroneous jury instruction that told the jury they *shouldn't* view the testimony of an accomplice with disfavor because it comes from a corrupt or polluted source.

The trial judge gave an instruction on accomplice testimony in connection with the testimony of William Riley. Riley testified that he went with Petitioner to Barnes's hotel room on the night of the murder for what he thought would be a robbery. (Doc. 24-3, ECF pp. 81, 99). He also testified that he rode with Petitioner and Barnes to York and

_____

[3] This particular argument was not presented to the state courts but we will deal with it anyway.

-8-

that Petitioner had dropped him off at a house there before the murder was committed. (*Id.*, ECF pp. 97-99). Riley had originally been charged along with Petitioner with the murder of Barnes but obtained a plea bargain to conspiracy to commit robbery. (*Id.*, ECF pp. 80-81).

The trial judge used a standard Pennsylvania instruction. However, instead of instructing the jury that they should view the testimony of an accomplice with disfavor because it comes from a corrupt or polluted source, the judge instructed them they should *not* view the testimony of an accomplice with disfavor because it comes from a corrupt or polluted source.

Petitioner claims the failure to object was ineffective assistance of counsel because Riley was an important witness who filled in the gaps in other witnesses' testimony and the instruction confused the jury as to how they were to consider accomplice testimony.

In its PCRA opinion, the superior court rejected this claim. It cited *Commonwealth v. Spotz*, 587 Pa. 1, 94-95, 896 A.2d 1191, 1247 (2006), for the proposition that jury instructions must be examined as a whole to determine if they accurately convey the required law. It decided that the instruction on corrupt and polluted sources "in its entirety" was "neither inconsistent nor contradictory." (Doc. 24-6, ECF p. 82).

The relevant jury instruction is as follows:

Accomplice testimony. This applies specifically to Mr. Riley, but the general concept applies to a number of witnesses in

the case.  An accomplice is somebody who knowingly and voluntarily cooperates with or aids or abets another in the commission of a crime.  And the idea is that if you are involved in a crime and somebody's trying to put the blame on you, it's very natural for you to say, oh, I didn't do it, he did it, and point the finger at somebody else.

There is a recommendation that's something that's likely to occur.  And therefore when a Commonwealth witness is involved in the crime that was charged, and therefore he's an accomplice, his testimony has to be judged by special precautionary rules because experience shows an accomplice will often try to place the blame falsely on someone else.

I recognize an accomplice may testify falsely in hope of obtaining favorable treatment as to his own charge, or for some other corrupt motive.  Also recognize that an accomplice may give perfectly truthful testimony. The special rules I give you are meant to help you distinguish between truthful and false accomplice testimony.  Like I said, that applies specifically to Mr. Riley who was an accomplice.

The special rules are as follows: First, you *shouldn't* view the testimony of an accomplice with disfavor because it comes from a corrupt and polluted source.  Second, you should examine the testimony of an accomplice closely and accept it only with care and caution.  Third, you should consider whether the testimony of an accomplice is supported in whole and in part by other evidence.

Accomplice testimony is more dependable if it's supported by independent evidence, however, even if there is no independent supporting evidence you may still find the Defendant guilty solely on the basis of an accomplice's testimony.  If after using the special rules I just told you about you are satisfied beyond a reasonable doubt that the accomplice testified truthfully, the Defendant is guilty.

(Doc. 24-3, ECF pp. 198-99)(emphasis added).

The superior court decided that these instructions accurately conveyed to the jury how they were to evaluate accomplice testimony, despite the one misstep in telling them they should not view the testimony of an accomplice with disfavor because it comes from a corrupt and polluted source. Other parts of the charge informed them they were to assess accomplice testimony cautiously. Those parts were: (1) an accomplice will often try to place the blame falsely on someone else; (2) accomplice testimony has to be judged by special precautionary rules; (3) accomplice testimony should be evaluated by whether it is corroborated by independent evidence (although the jury may nonetheless believe it on its own weight). (Doc. 24-6, ECF pp. 81-82, *Commonwealth v. Santiago*, No. 1346 MDA 2009 (Pa. Super. Ct. Aug. 18, 2010).[4]

We will deny Petitioner's claim. The superior court's ruling was not contrary to clearly established Supreme Court precedent or an unreasonable application of that precedent. *See Middleton v. McNeil*, 541 U.S. 433, 437, 124 S.Ct. 1830, 1832, 158 L.Ed.2d 701 (2004)(a single jury instruction is not viewed in isolation but must be analyzed in the context of the charge as a whole); *Real v. Shannon*, 600 F.3d 302, 309 (3d Cir. 2010)("'Habeas relief for a due process violation concerning an absent or defective jury instruction is available only when the absence of an instruction, or a defective instruction, infects the entire trial with unfairness.'")(quoted case omitted).

---

[4] The court buttressed its conclusion by noting that the trial court tied its accomplice instruction to an instruction about how the testimony of other witnesses with a similar incentive to lie should be carefully evaluated. (*Id.*, ECF p. 82).

3. *Trial Counsel Was Not Ineffective When he Failed to Object to the Trial Court's Explanation of Transactional Immunity to Kunta King*

Petitioner claims trial counsel was ineffective when he failed to object to the trial court's explanation of transactional immunity to Kunta King. King was a cocaine trafficker who employed Riley and Barnes as street-level dealers. The Commonwealth's position was that Petitioner, also a drug dealer, shot Barnes as part of the competition to control the drug trade in Hanover, Pennsylvania.

King testified generally to the drug trade in Hanover as background to the murder charge. He had been given immunity from prosecution for that testimony but at the beginning of his testimony was reluctant to testify, apparently not fully understanding that he had been granted immunity. The prosecutor reminded him that he had been granted immunity. The trial judge then explained to King that if he made any admission to selling drugs, the testimony could not be used to prosecute him for a drug crime. (Doc. 24-2, ECF p. 160). King then began to speak more openly.

Petitioner argues that counsel should have objected to the trial court's description of immunity because it was erroneous. (Doc. 2, ECF p. 34). According to Petitioner, King was informed that he had transactional immunity, which Pennsylvania does not recognize. If he had been correctly informed, he would not have provided the background on drug dealing that gave context to the shooting. (*Id.*, ECF p. 35).

In its PCRA opinion, the superior court disposed of this claim by saying that the trial court's characterization of the immunity granted King did not affect the outcome

of the case. The court noted that King's testimony did not involve the murder charge but only provided background. (Doc. 24-6, ECF p. 83-84, *Commonwealth v. Santiago*, No. 1346 MDA 2009 (Pa. Super. Ct. Aug. 18, 2010).

We will deny this claim. Putting aside the superior court's reasoning, Petitioner has no federal right to challenge the grant of immunity to a witness. *See generally, United States v. Lewis*, 456 F.2d 404, 409-410 (3d Cir. 1972).

4. *Trial Counsel Was Not Ineffective When He Failed to Object to the Trial Court's Mistaken Advice to Petitioner During the Right-to-Testify Colloquy that if Petitioner Testified, the Prosecution Could Enter Into Evidence "Any Prior Record" He Had*

A defendant's right to testify arises from several constitutional provisions, including the guarantee in the Fourteenth Amendment not to be deprived of liberty without due process of law. *Rock v. Arkansas*, 483 U.S. 44, 51 107 S.Ct. 2704, 2708-09, 97 L.Ed.2d 37 (1987). To be valid, a waiver of the right to testify must be knowing and intelligent. *United States v. Pennycooke*, 65 F.3d 9, 11 (3d Cir. 1995).

Petitioner claims trial counsel was ineffective when he failed to object to a piece of mistaken advice the trial court gave Petitioner during the right-to-testify colloquy the court conducted with Petitioner.[5] The court advised Petitioner that if he testified, the prosecution could enter into evidence "any prior record" he had. This advice was

---

[5] A defendant has no right to a colloquy with the trial court in which he is advised of his right to testify either under federal law, *Pennycooke*, 65 F.3d at 11, or Pennsylvania law. *Commonwealth v. Baldwin*, 8 A.3d 901, 907 n.5 (Pa. Super. Ct. 2010); *Commonwealth v. Todd*, 820 A.2d 707, 712 (Pa. Super. Ct. 2003). Nonetheless, some courts engage in the practice.

incorrect.  In Pennsylvania, generally only crimen falsi convictions, those involving

dishonesty or false statement, may be used against a witness.  *Commonwealth v.*

*Nieves*, 560 Pa. 529, 534, 746 A.2d 1102, 1105 (2000).  Petitioner contends that he

decided not to testify only because he thought the jury might see his entire record and

that his counsel should have corrected the trial court's advice.[6]

In pertinent part, the background to this claim is as follows.  After the

defense rested, the trial judge had the following colloquy with Petitioner:

> THE COURT: I just need to colloquy the Defendant on
> choosing not to testify.  Mr. Santiago, your counsel just
> indicated that the defense is resting without calling you as a
> witness.  You are aware of that, obviously?
>
> THE DEFENDANT: Yes.
>
> THE COURT: You do understand that you do have the
> absolute right to choose to testify if you wish?
>
> THE DEFENDANT: Yes, I do.
>
> THE COURT: And obviously you want to talk to your attorney
> about that and he made a determination to you as to whether
> you would testify or not.  Do you understand that?
>
> THE DEFENDANT: Yes, I do.
>
> THE COURT: But what he says isn't the final decision.  You
> make the final decision, you and you alone.
>
> THE DEFENDANT: Right.

---

[6] He also maintains that he has no crimen falsi convictions.  His postconviction
counsel indicates he did have a crimen falsi conviction.  (Doc. 24-5, ECF p. 115).  This factual
dispute was not resolved in the state courts.  We need not do so either to dispose of this
claim.

. . . .

THE COURT: You also understand that it is considered by many people to be important that a Defendant testify in a case, that the chance to get up and look a jury in the eye from the witness stand and swear to tell the truth and tell the jury I didn't do this, it would be considered extremely helpful to a Defendant and you are by passing the opportunity to do that?

THE DEFENDANT: Yes.

THE COURT: Now, obviously there can be bad parts to it, too, because the DA gets to cross-examine you and they get to put in any prior record you may have, that sort of thing. . . .

(Doc. 24-3, ECF pp. 164-165).

The court then advised Petitioner that if he wished to testify, the record could be reopened. Petitioner asked if he could speak to his lawyer. After conferring with counsel, counsel told the court Petitioner "would like to sleep on [the] decision." The court replied, "Fair enough, 8:30 tomorrow morning for that discussion with counsel." (*Id.*, ECF p. 166).

The next morning, the following exchange took place:

THE COURT: Let the record show that the Defendant and counsel are present. Mr Santiago, we had a discussion yesterday about the possibility of you testifying. And your counsel requested an opportunity to have you think about it over night and make your decision this morning. Have you had sufficient opportunity to talk to counsel about that?

THE DEFENDANT: Yes, I have.

THE COURT: What is your decision?

THE DEFENDANT: I won't be taking the stand.

-15-

THE COURT: Very well. . . .

(*Id.*).

At the PCRA hearing, trial counsel testified that the court's instruction was incorrect but that he was "sure" that it was "throughly discussed with [Petitioner], that the crimen falsi convictions would come from ten years."  (Doc. 24-5, ECF p. 115).[7]  He did not correct the instruction on the record nor does he recall correcting it off the record. (*Id.*, ECF p. 117).  He also testified that by the time the right-to-testify colloquy took place he had already discussed testifying with Petitioner and Petitioner had agreed with him that he would not testify:

> Understand something, by the time that the instruction is made,[8] we have concluded that he's not testifying.  We took a break so that [Petitioner] and [co-counsel] and I could digest whether or not it was appropriate for [Petitioner] to testify, and it was our recommendation that he should not testify for many reasons.
>
> . . . .
>
> So at the time that we are in front of [the trial judge], his lawyers have said it's not in your best interest and he communicated to us, I agree, I'm not going to testify.  So regardless of what [the judge] said, I don't care because I had already recommended to him as his lawyer that he not do so and he agreed.  So the decision has been made.
>
> So even if what [the trial judge] says is completely in error, it is our conclusion as a team he's not going to be testifying.  I understand what you are asking and apparently what he said

---

[7]  Pa. R. Evid. 609(b) requires that the conviction not be more than ten years old.

[8]  Meaning the trial court's colloquy.

was in error or partially in error, and the decision is mine.
Again, that's my long winded response.

(*Id.*, ECF pp. 116-17).

At the PCRA hearing, Petitioner stated that he had always wanted to testify but that trial counsel did not want him to do so.  Petitioner reserved his decision on testifying until the time came to do so.  (Doc. 24-5, ECF p. 142).  His trial counsel had also told him, consistent with what the court had said, that his past criminal history would come up if he testified and that the judge would explain that to him.  (*Id.*).

When the judge did tell him that all of his past criminal history would come in, he asked for a night to think about it.  The next morning, trial counsel "got into a heated argument with [Petitioner] about not testifying and he told [Petitioner] to trust him." (*Id.*, ECF p. 143).  Petitioner stated that he had "initially decided not to testify" based on the advice his counsel had given him, reiterating his position that counsel had told him that his past criminal history would come out.  (*Id.*).  However, according to Petitioner, he had no crimen falsi convictions, only one conviction for possession with intent to deliver. (*Id.*).  Petitioner testified that, had he been properly instructed, he would have testified at trial, denying that he committed the crime or having made any statements to police officers or admissions to inmates at the county jail.  (*Id.,* ECF p. 145).  He denied ever deciding that he would not testify, (*id.*, ECF p. 168), and asserted that when he told the court the next morning he would not testify, it was after his counsel had again told him that his past would come in, and so he did not testify.  (*Id.*, ECF p. 169).

In deciding this issue, we look to the last state-court decision on the merits, *Eley*, *supra*, 712 F.3d at 845 n.10, the Pennsylvania Superior Court's opinion dealing with Petitioner's PCRA appeal.  In resolving this claim against Petitioner, the court cited *Nieves*, *supra*, for the proposition that a defendant has the right to decide whether he will testify on his own behalf after full consultation with his counsel.  560 Pa. at 533, 746 A.2d at 1104.  It then ruled that trial counsel had not deprived him of that right because Petitioner had not relied on the trial court's misstatement to decide not to testify.  The superior court based its ruling on the following factual findings:

> During the PCRA hearing, trial counsel testified that he did not recall whether he specifically corrected the trial court's inaccurate statement.  However, following a long discussion with Appellant, he advised Appellant that testifying was not in his best interest.  N.T. PCRA, 6/29/09, at 15 [Doc. 24-5, ECF p. 116].  Trial counsel also informed the PCRA court that Appellant subsequently agreed that he was not going to testify.  *Id.*  The record supports the PCRA court's finding that trial counsel discussed all of the pertinent factors with Appellant prior to his decision to forgo testifying.  Accordingly, we find that the trial court's misstatement did not influence Appellant's decision and, therefore, trial counsel did not provide ineffective assistance in failing to object during the trial court's colloquy.

(Doc. 24-6, ECF p. 86, *Commonwealth v. Santiago*, No. 1346 MDA 2009 (Pa. Super. Ct. Aug. 18, 2010).

In arguing this claim, Petitioner relies upon the facts of record that support his position.  For example, he argues that he never agreed at any time not to testify, reserving that decision for when he had to make it, and that counsel told him, in accord with the trial judge's erroneous statement, that his past criminal record would come in if

-18-

he did testify.  (Doc. 2, memorandum, ECF p. 41).  And he points to his own testimony that he would have taken the stand if the trial judge had not mistakenly advised him that his entire criminal record would have come in.

However, we cannot make our own fact finding.  Our standard of review is not de novo.  *Eley*, *supra*, 712 F.3d at 845.   As noted above, state-court fact finding "is presumed to be correct," 28 U.S.C. § 2254(e)(1), and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  *Id.*  There is sufficient support in the record for the superior court's finding that: (1) trial counsel had discussed all the pertinent factors with Petitioner;[9] and (2) Petitioner had agreed that he would not testify.  It follows that the appellate court's conclusion that the trial judge's erroneous advice did not affect Petitioner's decision not to testify was also reasonable.

We recognize that it could be argued that the decision is based on a unreasonable determination of the facts in light of the evidence, in violation of section 2254(d)(2).  The discussion about testifying and the decision not to testify happened before the right-to-testify colloquy was conducted, and trial counsel did not testify specifically about any conversations after the colloquy in which he advised Petitioner about the trial judge's statement.  Nonetheless, we believe the record is sufficient because it can be inferred from counsel's testimony that, regardless of the erroneous advice, other factors compelled a decision not to testify.  We also note Petitioner's PCRA

---

[9]  We disagree with Petitioner that because counsel did not go into the details of the factors that his testimony is insufficient.

hearing testimony that trial counsel did have a "heated discussion" with him the next morning about not testifying and told Petitioner "to trust him," after which Petitioner stated on the record his decision not to testify. This is a further indication that the erroneous advice did not influence Petitioner.

Under section 2254(d)(1), we may also grant the writ if the state courts' adjudication of the claims was contrary to clearly established Supreme Court precedent or an unreasonable application of that precedent. The superior court's ruling was not contrary to clearly established Supreme Court precedent or an unreasonable application of that precedent.

B. *Petitioner's Fourth Amendment Claim Cannot Be Adjudicated in a 2254 Proceeding*

Before trial, Petitioner moved to suppress a Yankees jersey and cap that had been seized from his apartment.[10] A hearing was held. Relying on the plain view doctrine, the trial court denied the motion, and his ruling was upheld on appeal. Petitioner argues that the state courts erroneously decided his suppression motion and that the seizure of the clothing violated his Fourth Amendment rights.

In opposing this claim, Respondents argue that Petitioner had a full and fair opportunity to litigate his Fourth Amendment claim in state court and that under *Stone v. Powell*, 428 U.S. 465, 494, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), we cannot grant relief

---

[10] Forensic examination of the jersey and cap revealed the presence of gunshot residue.

on such a claim in habeas. In *Stone v. Powell*, the Supreme Court ruled that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 494, 96 S.Ct. at 3052 (footnotes omitted).

In reply, Petitioner argues the Third Circuit has recognized an exception to *Stone v. Powell* when the state courts failed "to give at least colorable application of the correct Fourth Amendment constitutional standard." *Gilmore v. Marks*, 799 F.2d 51, 57 (3d Cir. 1986). In those circumstances, there may not have been a full and fair opportunity to litigate the Fourth Amendment claim in state court, *id.* at 57, and it should thus be considered in the habeas proceedings.

Petitioner maintains that the state courts did not use the correct federal standard in evaluating his Fourth Amendment claim. Specifically, he asserts that the plain view doctrine has three factors that must be satisfied but that the state courts used only two of the factors in their analysis, and if all three of the factors had been used, the state courts would have found a Fourth Amendment violation.

We provide the factual background to this claim, taken from the superior court's opinion on direct appeal.

> In late 2003 Appellant was involved in the drug trade in the Borough of Hanover when two men from Allentown, William Barnes and William Riley, arrived in Hanover to sell crack cocaine for Allentown based dealer Kunta King. Police suspected that Appellant was involved with the Allentown men in a gun battle that occurred on December 9, 2003, at a York

tavern. On February 23, 2004, while police were continuing to investigate the tavern shooting Barnes was fatally shot on a street in York. Investigation into that shooting led York police detectives to suspect that Appellant was involved.

The law enforcement team investigating the tavern shooting ultimately applied for and received an arrest warrant for Appellant as well as a search warrant for his residence. Detective Anthony Fetrow was the affiant on the warrants which relied on a witness's positive identification of Appellant as the tavern shooter. The search warrant sought "any guns and or ammunition" in connection with the tavern shooting. Detective Fetrow assisted by Detective Troy Cromer executed the warrant on February 27, 2004, the same day he applied for it. On that date, Detective Fetrow knew that Appellant had been taken into custody on the arrest warrant when he arrived for a scheduled meeting with his parole officer in Harrisburg.

While Detectives Fetrow and Cromer were at Appellant's apartment searching for weapons in connection with the tavern shooting, the York detectives investigating the fatal shooting questioned Appellant about Barnes's death. During that interview Appellant told Detectives Scott Nadzom and Jeffrey Spence that on the night of the fatal shooting, he had been wearing a Yankees jersey and cap. Detective Nadzom was aware that Detective Fetrow had secured a search warrant for Appellant's residence in connection with the tavern shooting. Hoping that police were still at the apartment, Detective Nadzom contacted Detective Cromer and related a description of Appellant's clothing on the night of the fatal shooting. Detective Cromer, who received the call while still inside Appellant's apartment, already had observed clothing fitting that description on a chair and inside an open closet. As a result of the information from Detective Nadzom, Detective Cromer seized those items as well as some other items including several pairs of blue jeans, a lease and cell phone records. No weapons or ammunition were recovered.

(Doc. 24-4, ECF pp. 130-31, *Commonwealth v. Santiago*, No 401 MDA (Pa. Super. Ct.

July 31, 2006)).

In ruling that the plain view doctrine permitted the seizure of the jersey and cap, the superior court set forth the doctrine as follows:

> [U]nder the plain view doctrine, the warrantless seizure of a piece of evidence which is in plain view is permissible when just two criteria are met:
>
> First, the evidence must be seen from a lawful vantage point. Second, it must be immediately apparent to the viewer that the object observed is incriminating evidence. In other words, the observing officer must have probable cause to believe the evidence in question is contraband or incriminating evidence.

(*Id.*, ECF p. 143)(*quoting Commonwealth v. Harris*, 888 A.2d 862, 869 (Pa. Super. Ct. 2005)). The court then concluded that the doctrine was satisfied for the following reasons. First, the evidence was seen from a lawful vantage point because the detectives saw the clothing on a chair and in a open closet while they were "properly inside the apartment" executing a search warrant for weapons and ammunition. (*Id.*, ECF p. 144). Second, it was immediately apparent to the detectives that the clothing was incriminating because they knew Petitioner was a suspect in a homicide and because they had been given a description of the clothing Petitioner had worn the night Barnes was shot. (*Id.*).

Petitioner correctly asserts that the plain view doctrine is typically described as having three requirements. As the Third Circuit put it in *United States v. Telfair*, 507 F. App'x 164 (3d Cir. 2012)(nonprecedential), *petition for cert. filed*, No. 12-10747 (U.S. June 4, 2013):

In addition to the fact that the item must be in plain view, there are three requirements for a valid plain view seizure. *United States v. Menon,* 24 F.3d 550, 559 (3d Cir. 1994) (citing *Horton v. California,* 496 U.S. 128, 136, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990)). First, the officer must lawfully be in the place "from which the evidence could be plainly viewed." *Horton,* 496 U.S. at 136, 110 S.Ct. 2301. Second, the officer must have a "lawful right of access to the object itself," meaning the police cannot commit illegal trespass to access the item in plain view. *Id.* at 137, 110 S.Ct. 2301; *see also United States v. Davis,* 690 F.3d 226, 234 (4th Cir.2012)("[T]he lawful access requirement is intended to clarify that police may not enter a premises to make a warrantless seizure, even if they could otherwise see (from a lawful vantage point) that there was contraband in sight.") Third, the incriminating nature of the item must be "immediately apparent." *Horton,* 496 U.S. at 136, 110 S.Ct. 2301. (citation omitted).

Id. at 172.[11]

As Petitioner correctly points out, the superior court's plain-view analysis left out the requirement that the officer have a lawful right of access to the object itself. He maintains that this is an important difference because the purpose of this requirement is to prevent the police from seizing evidence in the absence of exigent circumstances, and the detectives conducting the search admitted that there were no exigent circumstances and that a second search warrant could have been obtained. (Doc. 24-1, ECF pp. 16, 22-23, suppression hearing transcript). It follows that Petitioner can pursue his Fourth Amendment claim because of the application of an incorrect constitutional standard.

---

[11] Talking about three requirements puts aside the requirement that the object be in plain view.

In asserting that the lawful-access requirement only applies when there are exigent circumstances, Petitioner relies on *United States v. Karriem*, No. 07-CR-706, 2008 WL 5118200 (D. N.J. Dec. 4, 2008). In *Karriem*, the court did say that this requirement "serves to prevent a specific search from expanding into a general, unlimited search absent exigent circumstances." 2008 WL 5118200, at *6. However, we disagree that this is the purpose of the lawful-access requirement. Instead, as the Third Circuit noted in *Telfair*, the lawful-access requirement prevents the police from committing an "illegal trespass to access the item in plain view." 507 F. App'x at 172 (citing in part *United States v. Davis*, 690 F.3d 226, 234 (6th Cir. 2012), *petition for cert. filed*, No. 12-8485 (U.S. Jan 29, 2013)). In other words, this requirement means that the officer must lawfully be in a position to seize the item.

Our conclusion means that the superior court did not apply an incorrect standard. First, contrary to Petitioner's assertion, the plain view doctrine does not require exigent circumstances, so the fact that there were no exigent circumstances is immaterial to the Fourth Amendment analysis. *But see United States v. McLevain*, 310 F.3d 434, 443 (6th Cir. 2002)(generally requiring exigent circumstances for application of the plain view doctrine). Second, although the superior court formally stated only two of the requirements, substantively its analysis also satisfied the lawful-access requirement. As part of its analysis on the requirement that the officers be lawfully in a position to be able to view the clothing, it noted that the officers were lawfully in the apartment executing a search warrant. This conclusion leads directly to the additional conclusion (although not

adopted by the superior court) that the officers did not have to commit an illegal trespass to seize the clothing, for they were standing lawfully in a place where they were in a position to seize the clothing.  In these circumstances, we will not apply any exception to *Stone v. Powell* that the Third Circuit might have recognized in *Gilmore*, an exception for a state-court failure to at least colorably apply the correct Fourth Amendment constitutional standard.  *Gilmore, supra,* 799 F.2d at 57.  The superior court did more than just colorably apply the plain view doctrine.  We will therefore dismiss the Fourth Amendment claim because under *Stone V. Powell* we cannot consider it on habeas.

C. *The Trial Court Did Not Violate Due Process in Allowing Shannon Ritter and Shanika Simms to Testify*

Petitioner claims that the trial court violated due process in allowing Shannon Ritter to testify.  Ritter testified that while he and Petitioner were at the York County jail, Petitioner admitted that he murdered Barnes.  The defense was unaware of Ritter until the eve of trial.[12]  Petitioner also claims the trial court violated due process in allowing Shanika Simms to testify as Simms was not disclosed until after trial had begun. Simms buttressed one aspect of the testimony of William Riley, where he testified that on the night of the murder Petitioner first dropped him off at a house in York where he stayed for about a half an hour.  (Doc. 24-3, ECF pp. 98, 108).  Simms testified she was

_____

[12]  The trial court concluded that the Commonwealth had properly disclosed Ritter to the defense but that "somehow in transition" trial counsel "didn't actually perceive it."  (Doc. 24-3, ECF p. 121).

at the house that night and saw Riley. (Doc. 24-3, ECF pp. 122-23).[13] As part, of this claim, Petitioner also argues the Commonwealth violated Pa. R. Crim. P. 573(B)(1)(b) by not supplying him with a timely copy of Ritter's statement.

We reject this claim. First, we cannot grant any relief on the basis of a violation of a state criminal rule. Section 2254 relief can be granted only for violations of federal law, not state law. *Swarthout, supra*, ___ U.S. at ___, 131 S.Ct. at 861. Second, as to federal law, "there is no general constitutional right to discovery in a criminal case." *Gray v. Netherland*, 518 U.S. 152, 168, 116 S.Ct. 2074, 2084, 135 L.Ed.2d 457 (1996)(quoting *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977))(internal quotation marks omitted); *Diggs v. Owens*, 833 F.2d 439, 443-44 (3d Cir. 1987).

Petitioner claims that under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), he had a due process right to timely disclosure that Ritter would be a witness and of his July 8, 2004, statement.[14] The statement revealed another witness, Reuben Davila, to what Petitioner admitted to Ritter. (Doc. 3-4, ECF pp. 10-11, Ritter statement). Specifically, Ritter stated that Petitioner "told me this stuff in front of Reuben." (*Id.* ECF p. 11). When Davila was contacted after trial, he stated that he was

---

[13] Simms became a witness after the trial began because she was a spectator at the trial and heard Riley's testimony. She then volunteered to testify about Riley's presence at her house that night. (Doc. 24-3, ECF pp. 119-20).

[14] A petitioner must exhaust state-court remedies before seeking habeas relief. 28 U.S.C. § 2254(b)(1)(A). Review of Petitioner's appeal to the superior court (Doc. 24-4, ECF p. 20) and supreme court (Doc. 24-4, ECF p. 161) indicate Petitioner has not exhausted the *Brady* claim. In any event, we will address it.

present with Ritter and Petitioner but that Petitioner "actually denied involvement with the proceeding and never admitted to this." (Doc. 3-4, ECF pp. 6-7, PCRA hearing transcript). Petitioner argues that Davila's statement was impeachment evidence if the Commonwealth had disclosed Ritter's statement under *Brady*.[15]

We disagree that *Brady* applies here. While Davila's statement might have been impeachment evidence, the Commonwealth did not have that statement before trial. It only had Ritter's statement, and Ritter only stated that Davila was present when Petitioner talked to Ritter. This is not impeachment material.

IV. *Conclusion*

We will issue an order denying the section 2254 petition. The order will also deny a certificate of appealability, based on the analysis in this memorandum. However, Petitioner is advised that he has the right for thirty (30) days to appeal our order denying his 2254 petition, *see* 28 U.S.C. § 2253(a); Fed. R. App. P. 4(a)(1)(A), and that our denial of a certificate of appealability does not prevent him from doing so, as

---

[15] Technically, the government's due process obligation to disclose impeachment evidence is governed by *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

long as he also seeks a certificate of appealability from the court of appeals. *See* Federal

Rule of Appellate Procedure 22; Local Rule of Appellate Procedure 22.1.


/s/William W. Caldwell
William W. Caldwell
United States District Judge


Date: August 7, 2013

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAM SANTIAGO,                    :
                Petitioner           :
                                     :
    vs.                              :    CIVIL NO. 1:CV-11-1319
                                     :
JOHN KERESTES, et al.,               :    (Judge Caldwell)
                Respondents          :
                                     :
                                     :

*O R D E R*

AND NOW, this 7th day of August, 2013, it is ordered that:

1.  The petition (Doc. 1) for a writ of habeas corpus pursuant
to 28 U.S.C. § 2254 is DENIED.

2.  A certificate of appealability is denied.

3. The Clerk of Court shall close this file.

/s/William W. Caldwell
William W. Caldwell
United States District Judge